Approach. Let us know your names and who you represent, please. My name is Linda Althoff and I represent Kevin Hall. Assistant State's Attorney Emma Nowacki on behalf of the people of the State of Illinois. Okay. You guys know the drill. Fifteen minutes per side. Try to save some time for rebuttal. And if we unduly bombard you, we might give you a little extra time. Okay? Thanks. Please proceed. Thank you, Your Honor. Kevin Hall was denied his right to a fair trial when the trial court refused him one last opportunity to pursue evidence that he had been seeking actively and diligently and that was material to his defense. Mr. Hall was facing charges that stemmed from allegations that he had abused N.T., who was his ten-year-old stepdaughter at the time of the allegations. The evidence that he was seeking to get in was that he had information from N.T.'s mother that N.T. had tested positive for chlamydia and Kevin Hall was prepared to present evidence that he, in fact, had tested negative. Kevin Hall initially was tried and his first trial ended in a hung jury. After that trial, counsel sought out evidence of this testing. She obtained a court order for medical records from Cook County Department of Health and found out from them that the case had been referred to a private agency, Family Health Services, in the suburbs. So counsel went on to obtain a court order to get the medical records from them. What she found out from that was that N.T. had an appointment made but did not keep the appointment. You know, I'm loath to interrupt somebody so early in the argument, but isn't it a fact that the defense counsel in this case at trial answered ready for trial? She did. I'm going to suggest, just in view of trying to protect your time here, that you talk about the issue of what was mentioned in opening and closing and the testimony of the expert, Dr. Rangala. Okay. The opening and closing arguments that ---- And the testimony of Dr. Rangala and, you know, the testimony that was allowed in about what her reaction to the physical exam was. Okay. Dr. Rangala testified that what the state emphasized in this closing argument was that she had witnessed numerous cases that this was an awful, awful case that she'd seen. It was heartbreaking to her. The prosecutor signaled that this was going to be her testimony in its opening statements. She elicited, obviously, this testimony at trial about all this, the extent of the injuries, that it had been the worst that she had seen, even though defense counsel objected several times when the prosecutor asked her how she felt when she saw these injuries. The court finally allowed the doctor to proceed on that and ---- Yeah, it was twice sustained and then the third bite at the apple it was allowed to get in, right? Right. In light of all the evidence that was entered, the testimony of the minor child, the testimony of Mr. Hall's ex-wife, I believe it was, why shouldn't we call that harmless error? Because we have to go plain error here because it wasn't included in the post-trial motion, right? Right. It was subjected to a trial and the post-trial motion was a little bit vague, so if this Court does find it waived, it is plain error. So why isn't it harmless error? It's not harmless error. The evidence against Kevin Hall was close enough to come under that. The evidence was close. There was no physical evidence linking Mr. Hall to the offense. It took, I think it was nine days, for the child to actually make a statement implicating him in response to the mother's repeated questioning, asking her, did something happen? Did Kevin do something to you? And it was nine days before the child actually came forward. As to the statement from Diane Sharp, the court heard that in the first trial, and it was still, or the jury heard that in the first trial and found a hung, was a hung jury. That is an ex-wife. She changed her testimony. We don't know what sort of biases she might have against Mr. Hall when she first made the statement. Apparently she made a statement to a grand jury. She said that that was influenced by one of the detectives. She changed her testimony at trial. So that testimony alone is not reliable enough to convict him. And so to really hammer home, in closing argument, for the state to really hammer home on the doctor's testimony and to really put that, bolster its case with things that were not really relevant, were not necessary for the jury to hear in order for it to make its determination. The state would tell us, though, that the defense at trial was that we know the defense. We know that the child was brutalized sexually in the way that the doctor described. So we're just saying it's not Mr. Hall. Right, which then becomes a question of why does there need to be so much emphasis on what this doctor thought. And it just makes it more inflammatory for the jury. What an awful thing to happen to this child. And when you look at some of the other arguments that the prosecutor made that, you know, imploring the jury to align itself with the child, this child doesn't need to be alone. Let me get back to the issue of the closeness of the evidence. You indicate that, in your view, nothing directly connects the defendant to the event. Right. But isn't it true that when the victim's mother came home and it was announced that she had come home, she saw the defendant leaving the room in just his boxers and a T-shirt, and when she went into the room and saw her daughter, she saw her daughter sitting on the bed covered with a blanket. And when she removed the blanket, the daughter was naked from the waist down, and the daughter was teary-eyed and unusually quiet. There's a connection, isn't there? Yes, but it's not physically. That was the mother's testimony, which the jury could choose to believe or disbelieve, in light of the fact that it's also her testimony that the mother was, you know, constantly trying to elicit this information. But it was uncontradicted evidence, unimpeached evidence, and somewhat damning evidence, isn't it? She walks out, her daughter's unusually quiet, teary-eyed, naked from the waist down. He's exiting the room in the boxers. At the moment, she comes into the house. Right. Yes, that is evidence of his guilt. I would say that it's not conclusive evidence. After that happened, what did mother and daughter do, though? Didn't they go for a ride in her new car? Right, right. And she took her and, I believe, started asking questions of the daughter, and the daughter didn't respond. It wasn't ultimately when the daughter came forward and acknowledged these events, didn't the daughter indicate that the reason she had remained silent for a nine-day period was that he had threatened to harm her mother if she had revealed these facts? So there's an explanation, as there often is in these kind of cases, for that silence, right? Sure. Yes, I mean, this is all evidence that the jury heard. The jury heard this evidence in two different trials. The jury might have chosen not to believe the evidence. And our argument is that in light of all the arguments that the prosecutor made, those were unfair arguments that would have pushed the jury to believe this witness when it had the reasons that it might have disbelieved it. Is there some legal reason why you think this court ought to be considering what happened in the first trial of this matter, that it ended in a mistrial? I just think that it's an indication of the closeness of the evidence, that you did have a jury that was unable to reach a conclusion. We read the record, though, from the first trial. That was a much different trial, it seems to me anyway, that was tried the first time. A lot more evidence, different kinds of witnesses, and a lot of collateral kind of arguments about buying the car  I just don't know if that's something that we should be relying on here. Well, I would have to look again, but I believe that the evidence about the car and all that, most of the evidence came in at the second trial as well, the evidence about the car. Okay. What don't you talk about, you have some time here, tell us about the argument that was made about, where the state suggested that whichever version of Ms. Sharp that they accepted, that there was penetration or that the defendant was guilty either way. Right. I mean, this is, again, a misstatement of the law based on his statements to Ms. Sharp, where primarily it did not establish the element of intent. And so he was not guilty based on, even if the jury believed the substance of the statements, that alone did not prove his guilt. And yet the prosecutor encouraged the jury to find that if it just looked at these statements alone and repeatedly referred to these statements as admissions or confessions, he would be guilty of this offense. And it's very different than a confession that's made to law enforcement or to an assistant state's attorney. Here, it didn't, he never suggested that he did anything. He didn't, it did not establish the element of the intent. Counsel, you indicated, you just said that if you just look at these statements alone, either way, he's guilty of this offense. But that's not what the record indicates, is it? That if you just look at these statements alone or if you just look at these two versions that this ex-wife gave, one to the grand jury and one to the jury, in isolation, he's still guilty either way. That's not what was said. They said, either way, he's guilty. And then they went on to read the instruction regarding any contact, however slight, constitutes penetration. But they didn't say to look at it in isolation, look at it in context. So even if we accept, if the jury embraced the testimony at trial that he told me she grabbed his penis and tried to put it in her anus, well, what does that say? Not necessarily that there's contact. But if we look at it in context and we consider the victim's testimony, the jury could then reasonably infer, could they not, that the contact occurred, however slight. So that would not be error in that sense, would it? But there's no intent with the contact. Well, again, in context, if we listen, if we accept the victim's testimony as well, well, that gives us the intent with the mens rea we're looking for, doesn't it? The problem with the prosecutor's argument was that it really focused in on Diane's statements. And whether or not the jury could find that there was contact there, it spent a lot of time talking about these statements and how forget about everything else, look at these, no matter which one you believe, he's guilty based on these statements. Did they say forget about everything else? I think that my recollection is that they said that, you know, even if you just look at, if you look at these. Either way. They said either way. Okay. Okay. I would have to review the exact wording that they used. Is this the kind of case that you believe we should follow, people versus blue, that the conduct of the prosecutor here, are you saying that it's the type of misconduct in the eyes of the defense that warrants a new trial? And if so, why? Yes, I would say that. If you look at the number of the arguments and the inflammatory nature of them, in people v. blue, they were very concerned with aligning the jury with the victim, which is what happened here. Kind of singing to the jury, this child, and yes, it was a terrible crime, and this child, the only way she can go on or something, you know, she's not alone anymore, she has you. Really aligning the jury with the victim, and also really hitting home with the doctor's testimony, how even this doctor thought it was so awful, and then kind of dirtying up the defense a little bit. Look at why did the defense even have to ask doctor questions? There shouldn't have been any questions. Well, of course the defense has a right to confront his accusers and to cross-examine the witnesses. And so just the cumulative impact of these arguments, the heartbreaking nature that the doctor saw compared to all these other cases, which were not in evidence, and really encouraging the jury to align with his child victim, the most sympathetic victim. Are you suggesting that those sort of tactics that you condemn in your brief were the product of the case having been mistried the first time around? I don't know for sure. I can't say why those became, why the prosecutor made those arguments. It's possible that they had to go at it, maybe they felt they had to go at it a little bit harder based on the first mistrial. And so I would say, you know, the cumulative nature of all these improper arguments, and just to go back to the first issue, which is, you know, briefed in the brief, but to have him not have an opportunity to bring forth that evidence that was also relevant to his case and not be allowed to even pursue this evidence about the positive test compared to his negative test, which cast doubt in light of all the other. Excuse me. When was the defendant tested and that negative result discovered? I don't think it's clear from the record, although I do think it was shortly after his arrest. After his arrest. Yeah, it's, I don't have the date of it. There was an order to have him tested for diseases. Now, she was tested for STDs, but apparently not for chlamydia by Dr. Ngala, right? Right. I believe that what the doctor said, that the test was inconclusive and that he couldn't get, she couldn't get a chlamydia is something that can be taken care of with antibiotics over a relatively short course of treatment. Right. So the timing would be important? It would be important. I assume that his test, he would have to test negative or positive before he gets treatment, and so if they could prove, and if the defense is able to bring in his negative testing early on, yes. I think, I mean, this is all information that should be able to come out and that the defense and the prosecution should be able to test. My point is you can't prove a negative unless you can establish a timeline. Right. For both parties. Right. Okay. Right. Or maybe you shouldn't ask for a continuance after you answered ready for trial. Well, that's true, but really, I mean, I don't know of any cases where the court denies a continuance just because a defendant answered ready for trial, and in fact, I think cases say that. There were a couple other dates given in order to, you know, try to find this supposed evidence from some clinic in Gary or something. I mean, it seems like the defense was given some time by the trial judge, same judge from the first trial, right? Yes, the defense did have opportunities, and the defense took action at each of those continuances and obtained court orders. I mean, these are medical records that are in the control of the state or the state's witness. You can't just go to the doctor's office and get them. You need court orders, and that's what the defendant and the defense counsel was doing, took action every time, came back to the court, reported what the results were. It's not like the day of trial. She came up with some new cockamamie evidence that was an attempt to delay trial. Those concerns aren't present here. She was actively seeking these things out. She wasn't making some new thing out that was in her control. Well, they knew at least no less than a week and a half before the second trial that Detective Jamison also potentially had the information as to where these documents, these records could be obtained. Is there any evidence in the record to suggest they reached out to Detective Jamison? No, the record doesn't show that she did. So to say they actively and diligently pursued this may not be quite undermined. Well, I would say that that's not enough. When you look at the minor inconvenience of a continuous to find out if Detective Jamison had that and to look at the importance that this was to the defense and the actions that she had taken, the fact that seven days lapsed when the information is in control of, you know, a state's witness, I mean, Detective Jamison was very active in the investigation and pursuing this prosecution. So it's likely that he may not have wanted to cooperate. And maybe the defense counsel is seeking assistance from the court or from the prosecution, but how are they going to get this information? Because it is in the. . . Well, we're speculating here, right? Well, it is, but. . . The question is what steps, if any, were taken, and the record is devoid of any action taken. In that seven days, but she hadn't taken action. In at least a week and a half, and that's at minimum. The state would argue and has argued that they had this information that Detective Jamison was possibly in possession of this knowledge much further back. But at least a week and a half before trial, and there's no evidence whatsoever that they took any steps to run that down until the denier is outside the courtroom and their witnesses are on standby. Well, in this case, wasn't there, I'm sorry, earlier in the case, a sort of open-ended request to the state for all information relating to this child's health? Yes. And would you consider it to be an ongoing and sort of open-ended request or not? I don't think it was an open-ended, ongoing. I mean, yes, before the first trial they did ask the state about this, and the state said there was. . . And was this alleged test in Indiana taken before the first trial? That we don't know. I mean, it was part of what they wanted to discover was this evidence out there. When was it taken? And in light of the, yes, the jury pool had been called in, but jury selection had not been started. Are you trying to get us to believe that somehow the state having a hold of this evidence purposely didn't turn it over to the defense? What the state's representation had been was that they were not aware of any positive tests. They never said that there was no test. So I don't know if the prosecutors inquired into whether any testing or looked into that. Their representation was we're not aware of any positive tests. You didn't say it in your brief. It's not in the record. You're not saying it here in oral argument, are you? You're not making that claim that they have the record and they're hiding it from you. You're not saying that. Right. I don't think that there's enough in the record to support that claim. However, they never denied that. . . You know, they never gave an affirmative explicit answer, no, she was tested, it was negative. Or, you know, the mom is confused, she was tested for this. Or she was not tested. What? Or she was not tested. They never said that either. No, they didn't say she was not tested. We don't know. We don't know. Okay. Right. And so in light of the minor inconvenience, there's really no downside when you compare it to the importance that this was to the preparation of the defense. Okay. Thank you. Thank you.